5 F.3d 10
 62 USLW 2209, 24 Envtl. L. Rep. 20,021
 OLIN CORPORATION, Plaintiff-Counter-Claim-Defendant-Appellee,
v.
CONSOLIDATED ALUMINUM CORPORATION,
Defendant-Counter-Claimant-Appellant,
Swiss Aluminum, Ltd., Defendant.
 No. 1431, Docket 93-7021.
 United States Court of Appeals,
Second Circuit.
 Argued May 5, 1993.
Decided Sept. 15, 1993.
 
 John M. Hessel, St. Louis, MO (Joseph E. Martineau, Neal F. Perryman, Lewis, Rice & Fingersh, of counsel), for appellant.
 James J. Harrington, New York City (Barry T. Bassis, Michael L. Gioia, Newman & Harrington, New York City, E. McIntosh Cover, Olin Corp., Stamford, CT, of counsel), for appellee.
 Before: MESKILL, PIERCE and WALKER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from an amended judgment entered on December 17, 1992 in the United States District Court for the Southern District of New York, Edelstein, J. The district court granted Olin Corp.'s (Olin) motion for partial summary judgment, denied Consolidated Aluminum Corp.'s (Conalco) motion for partial summary judgment and dismissed with prejudice Conalco's first claim for relief in its counterclaim which was based on the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq. (CERCLA).[1] The decision is reported at 807 F.Supp. 1133 (S.D.N.Y.1992). We affirm in part, vacate in part and remand for further proceedings.
 
 
 2
 At issue in this appeal is the proper interpretation of indemnity and release provisions contained in certain agreements entered into by Conalco and Olin. Conalco contends that these contractual provisions, which predated the enactment of CERCLA, are insufficient to relieve Olin of its liability under CERCLA for its pre-CERCLA activities at certain sites because the provisions contain no clear, unequivocal and express transfer of CERCLA liability. We hold that as to the site in Hannibal, Ohio these provisions are broad enough to require Conalco to indemnify Olin for CERCLA liability. However, as to environmental claims that might arise against Olin in the future based on its activities at sites owned by third parties (third-party sites), the district court was not presented with a case or controversy. Therefore, we remand this matter to the district court to amend the amended judgment to indicate that the claims in Conalco's CERCLA counterclaim as they pertain to third-party sites are dismissed without prejudice. On remand, the district court also should make findings and rule on Conalco's CERCLA counterclaim as to the Pennsylvania site.
 
 BACKGROUND
 
 3
 The facts are fully set forth in Judge Edelstein's opinion and order dated December 1, 1992. Olin Corp. v. Consolidated Aluminum Corp., 807 F.Supp. 1133, 1135-36 (S.D.N.Y.1992). We summarize only those facts necessary for an understanding of our disposition of the issues in this appeal.
 
 
 4
 Olin operated an aluminum plant in Ohio (the Hannibal site) from 1955 until December 1973. As part of its aluminum operations, Olin maintained processing equipment utilizing hydraulic fluid (Pydraul) manufactured by Monsanto Industrial Chemicals Company (Monsanto). The Pydraul contained polychlorinated biphenyls (PCBs) which CERCLA defines as a hazardous substance. See 42 U.S.C. Sec. 9601(14)(A); 33 U.S.C. Sec. 1321(b)(2)(A); 40 C.F.R. Sec. 116.4 (1992).
 
 
 5
 The district court found that until 1972 Olin was unaware that Pydraul contained PCBs and was toxic. Olin disposed of the Pydraul and many of its industrial byproducts by depositing them in an impoundment pool on the Hannibal site. Olin periodically set the contents of the pool afire and then drained what remained into a swale.
 
 
 6
 In 1972, Monsanto sent Olin a letter advising that PCBs were present in Pydraul and that certain prophylactic measures, such as high-heat incineration, were necessary to assure safe disposal. Olin responded by discontinuing use of the impoundment pool; it constructed a liquid waste incinerator to dispose properly of its Pydraul and other hazardous liquids. The district court found, however, that Olin took no action to eliminate contaminants from the impoundment pool or to clean up the surrounding soil.
 
 
 7
 After deciding to divest itself of all assets and liabilities of its aluminum business, Olin, in 1973, engaged in successful negotiations with Conalco for the sale of Olin's aluminum operations, including the Hannibal site. The parties signed several agreements to effectuate the sale, each of which contained very broad language which required Conalco to indemnify Olin for all post-divestment liabilities associated with Olin's ownership of the Hannibal site and the aluminum operations. However, none of these agreements specifically addressed allocation of environmental liabilities between the parties.
 
 
 8
 The Purchase Agreement, dated September 21, 1973, provides in pertinent part:
 
 
 9
 Conalco will ... deliver to Olin an instrument or instruments ... whereby Conalco shall assume and agree to be responsible for and to pay, perform, discharge and indemnify Olin against, all liabilities, obligations and indebtedness of Olin related to the Aluminum Assets or the Aluminum Affiliates or the Aluminum Subsidiaries as they exist on the Closing Date or arise thereafter with respect to actions or failures to act occurring prior to the Closing Date.
 
 
 10
 At the closing on January 1, 1974, the parties executed the Assignment and Assumption Agreement (Assumption Agreement) which provides in pertinent part:
 
 
 11
 Conalco hereby assumes and agrees to be responsible for and to pay, perform, discharge and indemnify Olin against, all liabilities (absolute or contingent), obligations and indebtedness of Olin related to the Aluminum Assets or the Aluminum Affiliates or the Aluminum Subsidiaries as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time.
 
 
 12
 On May 10, 1974, the parties entered into an agreement (Release) which provides in pertinent part:
 
 
 13
 In consideration of the payment on this date by Olin to Conalco of $3,700,000 ... Conalco hereby releases and settles all claims of any nature which Conalco now has or hereafter could have against Olin ... whether or not previously asserted, under or arising out of the Purchase Agreement ..., or the transactions contemplated thereby.[2]
 
 
 14
 We will refer to the Purchase Agreement, the Assumption Agreement and the Release collectively as the "Agreements."
 
 
 15
 Conalco has owned and operated the aluminum facility located at the Hannibal site since January 1, 1974. In 1986, the Ohio Environmental Protection Agency (Ohio EPA) concluded that the pool, as well as the soil adjacent and subjacent to the pool, was contaminated with PCBs and ordered remediation of this hazard. Conalco complied with this remediation order, incurring substantial cleanup costs. Conalco believed that Olin's disposal practices created the PCB contamination and sought voluntary contribution from Olin. Olin refused to contribute to the cleanup costs and filed this declaratory judgment action seeking, inter alia, a determination that defendants Conalco and Swiss Aluminum, Ltd. (Alusuisse)[3] are "liable to Olin for the costs of defending against, and for all losses in connection with, all claims against, and liabilities of, Olin arising out of its former aluminum business."
 
 
 16
 Conalco filed a counterclaim. Its first claim for relief was pursuant to CERCLA and sought (1) reimbursement for the $991,359.91 it allegedly spent cleaning up the Hannibal site, and (2) a declaratory judgment "declaring Olin liable for claims related in any way to the ... disposal of PCBs or any other hazardous substances or chemicals, including but not limited to the present and future clean-up costs at the Hannibal, Ohio plant property and the site of Eastern Diversified Metals in Hometown, Pennsylvania."
 
 
 17
 At the close of discovery, the parties filed cross-motions for partial summary judgment. Olin sought a partial summary judgment declaring Conalco contractually obligated to indemnify Olin for the alleged Hannibal site environmental liability and sought dismissal of Conalco's counterclaim. Conalco sought partial summary judgment that (1) Olin was liable to it for initial investigatory and monitoring costs of the environmental cleanup at the Hannibal site, (2) Olin was a "responsible party" under CERCLA and the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499, 100 Stat. 1613 et seq. (1986) (SARA), and thus was liable to it for contribution for any and all costs incurred as a result of Olin's disposal of hazardous wastes and contaminants on properties later sold to Conalco, (3) Olin was not relieved of its CERCLA and SARA liabilities as a result of the Agreements, and (4) Conalco was not liable to Olin under the Agreements for the costs of the cleanup of hazardous waste deposited by Olin.
 
 
 18
 Judge Edelstein first determined that CERCLA permits private parties to contract with respect to indemnification and contribution for environmental liability although each party remains fully liable to the government. 807 F.Supp. at 1137-39. He then discussed the proper interpretation of the Agreements at issue in this case. Id. at 1139-41. The judge decided that it was unnecessary to draft a uniform federal standard because state law should serve as the federal rule of decision when interpreting a contractual provision that purports to allocate CERCLA liability. Judge Edelstein concluded that, under New York law, the indemnification agreements entered into by Olin and Conalco were valid and enforceable. He reasoned that these Agreements were clear on their face and that their provisions shielded Olin from liability to Conalco. Because the judge determined that no ambiguity existed as to the proper interpretation of the indemnity clauses contained in the Agreements he denied Conalco's motion for partial summary judgment and granted Olin partial summary judgment, dismissing with prejudice Conalco's CERCLA counterclaim. Id. at 1142-43. After making the requisite findings pursuant to Fed.R.Civ.P. 54(b), the district court entered final judgment on the claims disposed of by the partial summary judgment.
 
 
 19
 This appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 20
 We review de novo an appeal from summary judgment, viewing the record in the light most favorable to Conalco, the nonmoving party. See, e.g.,Dube v. State University of New York, 900 F.2d 587, 597 (2d Cir.1990) (citations omitted), cert. denied sub nom. Wharton v. Dube, --- U.S. ----, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). When there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. See, e.g.,Gnazzo v. G.D. Searle & Co., 973 F.2d 136, 138 (2d Cir.1992).
 
 II. The Hannibal Site
 
 21
 The primary question we address in this appeal is whether the Agreements at issue, which predate the enactment of CERCLA and which make no mention of environmental liabilities, allocate to Conalco, the buyer, the subsequently created CERCLA obligation to clean up the Hannibal site, which Conalco claims was contaminated by Olin, the seller.
 
 
 22
 Section 107(e)(1) of CERCLA deals with the contractual allocation of CERCLA liability and contains two seemingly contradictory statements concerning whether a private party can enter into an indemnity agreement absolving itself of CERCLA liability. This section states as follows:
 
 
 23
 No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.
 
 
 24
 42 U.S.C. Sec. 9607(e)(1).
 
 
 25
 The district court interpreted this section to mean that under CERCLA private parties may contract with respect to indemnification and contribution but that, notwithstanding such contracts, all responsible parties remain fully liable to the government. Conalco does not dispute this holding on appeal. Rather, its main argument is that in order to transfer CERCLA liabilities an agreement must include a clear, express and unequivocal waiver of CERCLA rights. Conalco argues that the Agreements at issue here do not apply to CERCLA liability because they were entered into before CERCLA was enacted and do not contain a specific reference to environmental liabilities.
 
 
 26
 We first must consider whether federal common law or state law should apply in interpreting contractual provisions that purport to indemnify one against, or release one from, CERCLA liability. The district court decided that federal courts should incorporate state law when interpreting contractual agreements allocating CERCLA liability and applied New York law. The parties do not dispute this decision on appeal; both agree that application of either New York or federal common law would produce the same result in this case. We nevertheless pause to clarify our holding in a recent case that implicitly resolves this issue.
 
 
 27
 Subsequent to the filing of the main briefs in this appeal but prior to oral argument we decided Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49 (2d Cir.1993). In that case, a seller of a business brought a third-party suit seeking indemnification for environmental liability from the purchaser pursuant to certain sale and lease agreements entered into by the parties. On appeal, we addressed the question whether the district court had correctly interpreted the indemnification language contained in the agreements to exclude indemnification for CERCLA liability. Id. at 51. While it is clear that federal law governs the validity of releases of federal causes of action, see, e.g., Dice v. Akron, Canton & Youngstown R.R. Co., 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952); Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1457 (9th Cir.1986), we concluded without discussion that we would look to state law to provide the content of federal law. Commander Oil, 991 F.2d at 51. Therefore, the issue is settled in this Circuit. Because the district court correctly anticipated this holding and thoroughly explained its underlying rationale, we see no reason to expand on Judge Edelstein's well-reasoned analysis. See 807 F.Supp. at 1139-41; see also Mardan Corp., 804 F.2d at 1457-60 (also containing a detailed and well reasoned discussion of why state law should provide the general content of federal law on the interpretation of contractual releases from CERCLA liability).
 
 
 28
 The parties agree that New York state law is to be applied in interpreting these Agreements. We stated in Commander Oil: "Under New York law ... it is our function to 'discern the intent of the parties to the extent their intent is evidenced by their written agreement.' " 991 F.2d at 51 (quoting Int'l Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 99 (2d Cir.1989) (citing Slatt v. Slatt, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100 (1985))). "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." Slatt, 64 N.Y.2d at 967, 488 N.Y.S.2d at 646, 477 N.E.2d at 1100. However, as we also noted in Commander Oil, "in New York indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify." 991 F.2d at 51 (citing Heimbach v. Metropolitan Transp. Authority, 75 N.Y.2d 387, 392, 553 N.Y.S.2d 653, 657, 553 N.E.2d 242, 246 (1990)).
 
 
 29
 With these principles of New York law in mind, we now turn to our task of interpreting the indemnity provisions in question. These Agreements contain extremely broad language. As Judge Edelstein stated: "One would be hard pressed to draft broader or more inclusive indemnification provisions than those entered into by Conalco and Olin." 807 F.Supp. at 1142. Indeed, we noted at oral argument that it seemed to us that the contractual language at issue was virtually airtight.
 
 
 30
 Conalco cites a New York case, Huskission v. Sentry Ins., 123 A.D.2d 832, 833, 507 N.Y.S.2d 447, 449 (2d Dep't 1986), for the proposition that the parties had the relevant existing law in mind when they contracted and the contract should not be interpreted to include later statutory enactments that changed the obligations of the parties "absent a clear expression in the contract that such is the parties' intention." We agree. These Agreements, however, do contain such a clear expression of the parties' intent.
 
 
 31
 The Purchase Agreement requires Conalco to indemnify Olin against "all liabilities, obligations and indebtedness of Olin related to [its aluminum business] ... as they exist on the Closing Date or arise thereafter." (emphasis added). In the Assumption Agreement executed at the closing, Conalco agreed to "indemnify Olin against, all liabilities (absolute or contingent ), obligations and indebtedness of Olin related to [the aluminum business] ... as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time." (emphasis added). Finally, the Release provides that Conalco "releases and settles all claims of any nature which Conalco now has or hereafter could have against Olin ... whether or not previously asserted." (emphasis added).
 
 
 32
 Notwithstanding the fact that CERCLA did not exist at the time these contracts were executed, we hold that as to the Hannibal site, these contractual provisions are sufficiently broad to encompass CERCLA liability. The language evidences the parties' "clear and unmistakable intent" that Conalco indemnify Olin for all liabilities related to the Hannibal site, even future unknown liabilities.[4] We are not convinced, therefore, by Conalco's argument that "in order to release CERCLA liability, the agreement must include a clear, express and unequivocal waiver of CERCLA rights."
 
 
 33
 Nevertheless, Conalco presents a very strong equitable argument. Conalco contends that CERCLA, which imposes strict liability and casts a broad liability net, was a previously unimaginable scheme. The district court's decision forces Conalco, an apparently innocent purchaser of land, to assume a liability that did not exist at the time of contract for conditions that it did not create. However, Olin's argument is also not without strong equities in its favor. As to the Hannibal site, Olin contracted to release itself from all liability arising from its previous ownership of its aluminum business. Clearly the inclusion of the broadly worded contractual provisions affected the selling price Olin received. This was a contract between two large, sophisticated companies who hammered out an agreement and expected to be able to rely on its terms.
 
 
 34
 In resolving a dispute where there are equities in favor of each side, we must respect the unambiguous contractual language. We agree with Olin that this language is broad enough to require Conalco to indemnify Olin for CERCLA liability. We acknowledge that this is a seemingly harsh result for a company that must pay for the cleanup of contamination that it apparently did not cause. However, we are unwilling to ignore the broad inclusive language of agreements freely entered into by two sophisticated parties. Parties should be able to rely on the terms of an agreement arrived at after arduous negotiations.
 
 III. Third-Party Sites
 
 35
 At oral argument Conalco asserted that Olin contends, and the district court's holding requires, that Conalco must indemnify Olin not only for any environmental liability to which Olin might be subject due to its activities at the Hannibal site but also for any environmental claims involving third-party sites that might arise against Olin that are in any way related to Olin's former aluminum operations. When we asked Olin's counsel if he agreed that this was the import of the district court's holding, he responded that this appeal involved the Hannibal site. He did agree, however, that the district court's opinion was applicable to how the Agreements should be read generally. He explained that there were other sites that Conalco does not own to which Olin had previously sent waste from its aluminum operations. Olin's position appears to be that the Agreements are broad enough to require Conalco to indemnify Olin if in the future Olin is held liable for environmental problems at any of these unnamed sites.
 
 
 36
 The district court's opinion focused on the Hannibal site and dismissed the first claim for relief of Conalco's counterclaim. Conalco contends, in essence, that the district court's decision allows Olin to treat Conalco as an insurance company as to Olin's former aluminum operations even as to potential liability resulting from Olin's dumping of hazardous substances at third-party sites. To determine whether Conalco is correct that the district court's ruling means that Conalco must indemnify Olin for CERCLA liability as to other sites, we must examine the pleadings.
 
 
 37
 In its counterclaim Conalco alleged that "[u]pon information and belief, Olin disposed or caused to be disposed Pydraul containing PCBs which may have contaminated certain unknown pieces of property which may require cleanup." (emphasis added). In its first claim for relief Conalco sought, inter alia, a judgment declaring Olin liable for environmental claims "including but not limited to the present and future clean-up costs at the Hannibal, Ohio plant property and the site of Eastern Diversified Metals in Hometown, Pennsylvania." (emphasis added). In its amended complaint, Olin sought, inter alia, a declaratory judgment that "defendants [are] liable to Olin for the costs of defending against, and for all losses in connection with, all claims against, and liabilities of, Olin arising out of its former aluminum business."
 
 
 38
 The district court made no mention of any third-party sites. Conalco is correct, however, that in dismissing with prejudice Conalco's CERCLA counterclaim the district court's ruling arguably forecloses Conalco from bringing an action in the future to determine the respective liabilities of the parties if a cleanup of one of these third-party sites is ordered. Therefore, we must decide if the district court's dismissal with prejudice of Conalco's CERCLA counterclaim was proper.
 
 
 39
 Article III of the Constitution limits the jurisdiction of the federal courts to actual cases and controversies, as distinguished from "advisory opinions." F.X. Maltz, Ltd. v. Morgenthau, 556 F.2d 123, 125 (2d Cir.1977). On this record, we do not believe an actual controversy exists between Olin and Conalco as to sites other than Hannibal and the Pennsylvania site.
 
 
 40
 Under the Federal Declaratory Judgments Act, Congress has authorized declaratory judgments only "[i]n ... case[s] of actual controversy." 28 U.S.C. Sec. 2201. The Supreme Court has noted that the question we must ask is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (emphasis added); seeKidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991). The controversy must be "real and substantial ... admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617, reh'g denied, 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1937). "Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." Kidder, Peabody & Co., 925 F.2d at 562.
 
 
 41
 Whether Olin someday will be held subject to environmental liability at some unknown third-party site is speculative. Therefore, whether Conalco should be required to indemnify Olin for such liability should it ever arise is not a question of "sufficient immediacy and reality" to warrant the issuance at this time of a declaratory judgment. Other than the controversy over the Pennsylvania site, we can find no mention of any pending environmental claim as to any third-party site in the pleadings or record. To allow the district court's ruling to stand, with its implication for these third-party sites, would not only be advisory it would also be imprudent. The record fails to indicate the location of these sites,[5] and we do not even know the types of claims that might be asserted in the future. We cannot allow the declaratory judgment procedure to be used as a "medium for securing an advisory opinion in a controversy which has not arisen." Coffman v. Breeze Corps., 323 U.S. 316, 324, 65 S.Ct. 298, 302, 89 L.Ed. 264 (1945).
 
 
 42
 Because there was no actual controversy before the district court as to these third-party sites we vacate the district court's holding insofar as it dismissed with prejudice claims pertaining to these sites. The district court should amend the amended judgment to provide that the claims in Conalco's CERCLA counterclaim dealing with third-party sites, other than the Pennsylvania site, are dismissed without prejudice.IV. The Pennsylvania Site
 
 
 43
 As we noted above, Conalco's CERCLA counterclaim also sought a judgment declaring Olin liable for environmental claims related to the Pennsylvania site. In its complaint, Olin mentioned this site as well, stating:
 
 
 44
 Olin has demanded, pursuant to the aluminum agreements, that Conalco engage in discussions with the United States Environmental Protection Agency respecting Olin's potential responsibility under federal environmental laws to participate in or to pay for clean-up of alleged contamination of the site of Eastern Diversified Metals, in Hometown, Pennsylvania, and that Conalco indemnify Olin in respect of that matter. Conalco has refused to do so.
 
 
 45
 We have found very little else in the record pertaining to the Pennsylvania site. Indeed, we are not even certain who currently owns this site nor do we know the exact status or nature of the alleged claims that have been asserted against Olin pertaining to it. We did find in the record an Olin interoffice memorandum that states that Olin is listed as a potentially responsible party as to this site because it "used the facility for the recovery of aluminum from a small amount of insulated wire in 1973." The district court, however, made no findings as to the Pennsylvania site. In fact, the district court did not even mention it in its opinion. However, it stated: "This Court finds that the indemnity provisions contained in the [Agreements] are sufficiently broad to indemnify Olin against liability to Conalco pursuant to CERCLA.... [T]hus, partial summary judgment in favor of Olin is appropriate." 807 F.Supp. at 1142-43 (footnote omitted). Given that Conalco raised the issue of the Pennsylvania site in its counterclaim, this holding arguably resolves the issue of CERCLA liability as to the Pennsylvania site.
 
 
 46
 "As an appellate court ... we cannot make findings of fact." Julie Research Laboratories v. Select Photographic Engr'g, 998 F.2d 65, 67 (2d Cir.1993). Therefore, "[w]ithout guidance from the district court, we are in no position to review the district court's [implicit] rejection of [Conalco's] claim [as to the Pennsylvania site]." Id. at 67 (citing Fed.R.Civ.P. 52). For these reasons, we ask the district court on remand to make findings and then rule on Conalco's CERCLA claim in its counterclaim insofar as it pertains to this site.
 
 CONCLUSION
 
 47
 We affirm the amended judgment of the district court as to the Hannibal site. We vacate the amended judgment insofar as it applies to the third-party sites and remand to the district court to amend the amended judgment to indicate that the claims in Conalco's CERCLA counterclaim dealing with third-party sites, other than the Pennsylvania site, are dismissed without prejudice. We also direct the district court on remand to make findings and explicitly rule on Conalco's CERCLA counterclaim as it pertains to the Pennsylvania site.
 
 
 
 [1]
 Conalco's counterclaim also contained a second claim for relief that was based on breach of contract. This second claim is not involved in this appeal
 
 
 [2]
 The parties dispute the nature of the $3.7 million payment. Conalco claims that this money was paid as an adjustment in the purchase price to reflect variations in the December balance sheet. Olin argues that the money was consideration for the release it obtained. We find it unnecessary to resolve this dispute because the language in the Release is clear. Furthermore, although we analyze all three agreements, the language in the Purchase Agreement and Assumption Agreement is sufficient to support our holding
 
 
 [3]
 At the time of the sale, Alusuisse owned 60 percent of the voting stock of Conalco. Alusuisse is not a party to this appeal
 
 
 [4]
 Conalco argues that under New York law, the burden of proof is on Olin which is seeking to enforce the terms of the contract and that Olin has failed to meet it. This argument fails because it is Conalco, "the releasor[, which] ... must sustain the burden of persuasion if [it] is to establish that the general language of the release, valid on its face and properly executed, is to be limited because ... [it] does not represent the intent of the parties." SeeMangini v. McClurg, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513-14, 249 N.E.2d 386, 390 (1969); see alsoMardan, 804 F.2d at 1462
 
 
 [5]
 At oral argument, Conalco stated that it did not know where all of these third-party sites are located and that perhaps some are even located outside of the United States